IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 3:24cr316-2 |
| | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| RASHAAD KHALID CHE TAYLOR, | : | |
| **Defendant** | : | |

## MEMORANDUM

Rashaad Khalid Che Taylor stands accused of numerous crimes related to production and possession of child pornography.[1]  Taylor seeks to suppress the contents of his cellphone.  He contends that suppression is warranted based on officer conduct during the execution of two search warrants looking for that device. (Doc. 55, as amended/corrected by Doc. 78).

After a multijurisdictional investigation, officers formulated a plan to execute the search warrants on the defendant and his residence on a Saturday morning. But the defendant left home early that day and headed toward the exit of his

---

[1] Specifically, Taylor is charged with eight counts in a superseding indictment: 1) conspiracy to produce child pornography, in violation of 18 U.S.C. §2251(a) and (e); 2–3) two counts of production of child pornography, in violation of 18 U.S.C. §2251(a) and 2; 4) one count of coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. §2422(b); 5) one count of possession of child pornography, in violation of 18 U.S.C. §2252(a)(4)(B); 6) one count of commission of a felony sex offense by an individual required to register as a sex offender, in violation of 18 U.S.C. § 2260A; 7) one count of transferring obscene matter to a minor, in violation of 18 U.S.C. §1470; and 8) one count of tampering with documents or proceedings, in violation of 18 U.S.C. §1512(c)(1). (Doc. 42).

gated community. When he did, officers stopped his car on the road leading to the gate. Shortly after being Mirandized, Taylor unequivocally invoked his right to counsel.

However, the interactions between law enforcement and the defendant about his electronic devices did not immediately cease while on the side of the road. A detective asked Taylor where to locate his cellphone inside the car. The defendant told her its location and consented to the police retrieving the device. That same detective asked the defendant if he would let them into his house. The defendant said he would. A different detective asked Taylor if the house keys were in the car. The defendant advised that the house was unlocked. Later on, as Taylor sat in his living room while officers searched for additional devices within the home, a detective asked for the passcode to the cellphone. The defendant provided it: 4-0-0-5.

With his motion to suppress, Taylor is right to flag officer conduct. Detectives talked to the defendant and asked him questions after he invoked his right to counsel. This violates the rule established in Edwards v. Arizona, 451 U.S. 477, 484–85 (1981). Accordingly, Taylor's statements to the detectives after he invoked his right to counsel will be suppressed.

However, Taylor seeks a further remedy that the law does not provide. That is, an Edwards violation only requires suppression of the defendant's

2

statements to the detectives after he invoked his right to counsel. It does not require suppression of derivative physical evidence, i.e., the photographs, messages, group chats, and other data stored on the phone.

To suppress that evidence, Taylor would need to show that his will was overborne by police conduct. The record supports the opposite conclusion. Each time detectives spoke to the defendant, they gave him choices or options. Each time, the defendant selected the option that gave the police a shortcut to the evidence they were looking for in the search warrants. As clear as the bodycam footage is regarding the violations of Edwards, it is equally clear that the detectives let the defendant choose each step in the police order of operations after he invoked his right to counsel.

The inevitable discovery doctrine also applies. As it turns out, the officers asked Taylor for keys they did not need in two different respects. A detective asked the defendant for keys to an unlocked house. That same detective later asked for a cellphone passcode that was on the phone itself. The passcode was not taped to the back of the phone, but it might as well have been. When a detective ran a forensic extraction on the device without the passcode, the phone's data contained 4-0-0-5 in a few places. The extraction revealed that the passcode was stored on the device, set to auto-fill. Additionally, the same four-digit code Taylor used to unlock his phone was also the code he gave visitors to

3

enter his gated community. The extraction software found it sitting among his unencrypted messages.  A four-digit code stored on the phone, identical to the code the defendant shared with visitors to his community, would not have remained a mystery for long.  Accordingly, for the reasons below, Taylor's motion to suppress will be denied.

**Background**

The child pornography charges in this matter stem from an investigation into Defendant Rashaad Taylor and two other individuals, Kevin Abbott and Anthony Hoffman.  The investigation was led — at least in later stages — by Molly Carson, the chief detective of the Pike County District Attorney's office and a task force officer with the Department of Homeland Security.[2]  (Doc. 84, Transcript of Suppression Hearing, 12/08/2025 ("H.T.)", 15:18–16:6).  Carson's task force investigations focus on child sexual abuse and child pornography production, like the conduct alleged in this case. Id., 16:7-9.

In this case, Detective Carson obtained two warrants to search Taylor's person and his residence for electronic devices — devices that the government contends were used to further the crimes charged in this matter, including a

---

[2] Abbott is Taylor's co-defendant, charged with several of the same offenses.  He pled guilty and is awaiting sentencing. (Doc. 39).  Hoffman is separately charged at No. 3:25-cr-33 for possession and production of child pornography.

4

conspiracy to produce child pornography.  Carson was on hand with other detectives to execute the search warrants.  She performed a forensic extraction of the data on a recovered cellphone.  And later, after the Pike County District Attorney flagged a "Miranda issue," Carson performed at least one additional forensic extraction of the data from Taylor's device.  The contents of that cellphone are central to the government's prosecution of the various child pornography charges in this case.

Specifically, the government accuses Taylor of becoming involved in a sexual relationship with Kevin Abbott, which focused on meeting other individuals for group sex. (Doc. 42, Superseding Indictment, ¶ 5).  On January 15, 2023, Taylor, Abbott, an unnamed co-conspirator, and at least one other individual allegedly engaged in group sex with a minor victim, age 17, in a hotel room in Lackawanna County, Pennsylvania. Id. ¶¶ 3, 10.

The government alleges that this seventeen-year-old is not the only minor victim.  Abbott, Taylor, and a second victim, age 15, allegedly communicated in a group chat. Id. ¶¶ 4, 16–18.  According to the superseding indictment, the second minor victim complied with Taylor's instructions to create and send pornographic images of himself. Id. ¶ 18.

The defendant's alleged communications with a third minor, age 13, led to his arrest.  Detective Carson testified regarding the initial stages of the

investigation, which she conducted in conjunction with Detective Eric Donaldson of Slate Belt Regional Police Department. [3] (H.T., 23:20–25:18).  Specifically, in September 2024, officers with Slate Belt Regional were contacted by this child's sister, also a minor, who reported that her brother was having ongoing contact with an adult named "Ray Ray." Id. 20:20–23:19.  According to Detective Carson's affidavits of probable cause, the thirteen-year-old purportedly met Ray Ray on two occasions.[4]  (Gov. Exs. 2–3).  As advanced, Ray Ray then continued communicating with the boy.  He allegedly sent the child pictures of his erect penis and the two were making plans to meet again in person. (H.T., 20:20–23:19).

Per the police, Ray Ray's cellphone number traced back to the defendant, Rashaad Taylor. Id., 23:20–25:18.  During this initial investigation, authorities discovered that the defendant had a prior conviction for possessing child pornography and was a registered sex offender. Id.

Consequently, Detective Carson obtained several warrants, including a search warrant for the defendant's residence and for the electronic devices inside. (Gov. Ex. 2).  Carson also obtained a second search warrant for the

---

[3] The Slate Belt Regional Police Department has police jurisdiction over several municipalities in Northampton County, including the Borough of Pen Argyl where the minor child allegedly resided.

[4] Although the alleged victim resided in Northampton County, Detective Carson became involved in the investigation because the defendant resided in Pike County. Id. at 18:13–20:19.

defendant's person and for any electronic devices on his possession. (Gov. Ex. 3). Finally, to track Taylor's movements, Carson obtained a ping warrant, which provided the police with the location of the defendant's cellphone. (H.T., 25:9–27:19). In Carson's experience, "it was important to get [Taylor's] electronic devices that could, potentially, corroborate what these children were reporting." Id., 25:19–26:4.

On Saturday, September 14, 2024, Detective Carson and at least six other municipal and state law enforcement officers were on hand to execute the search warrants. Id., 30:8-9, 35:13-21, 75:22–77:3. They met inside Taylor's gated community between 5:00 and 6:00 AM. Id., 32:4-23. However, before officers could execute the search warrants on Taylor at the residence, they observed the defendant driving in his vehicle toward the gate. Id., 32:9–34:2, 37:22–38:2. They conducted a vehicle stop of the defendant at approximately 6:05 AM. Id.

Four police vehicles pulled up behind Taylor's vehicle with their overhead lights activated. Id., 95:10-18. Taylor was removed from his car, handcuffed, and placed towards the back of his own vehicle. Id., 95:19–96:2.

7

### *Taylor Invokes His Right to Counsel*
### *Detective Carson Asks Questions Related to the Location of the Cellphone*

According to Detective Carson, the administration of defendant's <u>Miranda</u> warnings was not captured on video because the officer wearing a bodycam was not the first to interact with the defendant.[5] <u>Id.</u>, 40:3-13.

Based upon the defendant's arguments in support of suppression, the court has thoroughly reviewed the bodycam footage supplied by the government. Upon review, the bodycam video captured 30 seconds of video footage without audio prior to being manually activated by the officer. (Gov. Ex. 4, Warning BWC). That muted video footage captures Taylor being handcuffed by Detective Matthew Brown of the Pike County District Attorney's Office. The footage also captures Detective Carson to Taylor's right, speaking with the defendant and looking and gesturing in the direction of Detective Donaldson, who approaches Taylor from his front. The body camera does not capture audio of any <u>Miranda</u> warnings. But based on the evidence and testimony supplied by the government, the court finds that <u>Miranda</u> warnings were administered in this case.[6] <u>Id.</u>, 0:00–0:30.

---

[5] That individual was identified as Officer Warning of the Slate Belt Regional Police Department. (H.T. 75:7-12, 76:24-25).

[6] According to Detective Carson, officers administered <u>Miranda</u> warnings as Taylor was being handcuffed. (<u>H.T.</u>, 39:10-24). Officer Brandon Gargan of the Milford Borough Police Department briefly testified at the suppression hearing. He performed a supporting role in executing the search warrants. <u>Id.</u>, 114:15–119:10. Gargan rode with Detective Brown to the

At the rear of Taylor's vehicle, Detective Donaldson from the Slate Belt Police Department engaged Taylor as follows:

| | |
|---|---|
| **Donaldson:** | So, you had a conversation with a 13-year-old boy that day, the other day. So we have a search warrant… |
| **Taylor:** | [Inaudible] |
| **Donaldson:** | What's that? |
| **Taylor:** | [Inaudible] |
| **Donaldson:** | You did. All right, so we have a search warrant for you for your devices and stuff like that. At your house, we have a search warrant for your…Ok. Do you understand? |
| **Taylor:** | Yeah. |
| **Officer:** | Ok. |

Id., 0:30–0:56. [7]

---

scene and was involved in pulling over Taylor's vehicle. Id. 115:16–116:21. Gargan testified that Detective Brown provided Taylor with Miranda warnings. Carson and Gargan testified credibly. Thus, to the extent that any of Taylor's suppression arguments hinge on the non-administration of Miranda warnings, those arguments are rejected.

[7] From Carson's testimony, the court has pieced together the identities of the officers interacting with Taylor at the rear of his vehicle. Detective Donaldson (Slate Belt RPD) is the first member of law enforcement to be heard on the bodycam footage engaging with the defendant. (H.T. 40:17-21). He is identifiable as wearing a black Under Armour ballcap and a black vest with the word "POLICE" displayed in silver screenprint on the back. Detective Brown (Pike County DA's office) is observed initially handcuffing Taylor and then shining a flashlight inside the vehicle. He is identifiable by his glasses and a black vest with "DISTRICT ATTORNEY'S OFFICE" in yellow on the back.

Detective Carson, search warrants in hand, then began asking Taylor a series of questions about the occupants of his home and his electronic devices. Carson followed up, more pointedly: "One of the things we're worried about is you having contact with this 13-year-old, asking for naked pictures, and you already have a child porn conviction. So, are we going to find child porn on your phone?"

Taylor responded, "No." Id.,1:13–1:48.

Carson replied, "It's better if we know now." Id.,1:48–1:50.

Taylor's verbal reaction was mumbled and inaudible, but, based on context, the defendant responded in the negative. Id., 1:50–1:52.

Detective Donaldson interjected, "You sure?" Id., 1:52–1:53.

Taylor's response was clear and coherent: "I'm not answering any of your questions without a lawyer present." Id., 1:53–1:57.

Carson replied, "No problem," and stepped over to the driver's side door. Detective Brown had migrated over to this location during the above discussion and was shining a flashlight inside the car. Carson and Brown had a brief inaudible exchange.[8] Id., 1:57–2:07.

---

[8] Detective Carson testified that Brown made a remark to her "that he believed the cellphone was in the cup holder or center console area, because there was some sort of object there." (H.T. 42:2-8).

10

She quickly stepped back to Taylor and asked, "Where's your phone in here?" Taylor responded, "Glove compartment." Id., 2:07–2:12.

Detective Carson then asked Taylor if she had his consent to get the phone from the glove compartment. After approximately four seconds of silence, Detective Brown referenced impounding and towing the vehicle. He asked the defendant, "Which one is it? It's up to you." Id., 2:20–2:33.

Taylor replied either, "You can go ahead," or "You can go get it." That is, the defendant deliberated and chose cooperation over an impounded car. Id., 2:33–2:37.

### Detectives Carson and Brown Discuss Entry into the Home with Taylor

The officers continued to pose different alternatives to the defendant. Regarding entry into the home, Detective Carson asked whether the defendant wanted to let them in the residence without officers having to "bash the door in." In response to Taylor's pause, filled with an "ummm," she referenced the search warrants in her hands and stated, "If you don't let us in, we're just going to have to ram the door, unfortunately…It's up to you." Taylor again deliberated and chose the alternative that did not involve property damage. Id., 2:42–3:04.

Detective Brown, with his finger pointed toward the interior of the vehicle, asked if there were keys to the house in the car. The defendant turned his head

away from the detectives, stared off into the morning twilight and then, looking directly at the bodycam, stated, "No, my door is unlocked." Id., 3:04–3:18.

Prior to transporting Taylor to his residence for execution of the warrant, Detective Donaldson conducted a search of the defendant's person as authorized by the other warrant.  He located a cellphone charger in Taylor's pocket, among other things.  Id., 3:53–5:37.

### ***Detective Brown Obtains the Passcode to the Phone From Taylor Detectives Discover "Two Daddies and a Son"***

Authorities transported Taylor to his split-level home and they executed the search warrant without breaking down any doors.  Officer Warning's bodycam captured the work of other officers as they moved around the residence.  Of note, Detective Carson located a desktop computer in the basement and discussed seizing it with the other officers. Id., 10:43–10:54.  Officers also discussed encountering a rotary telephone making an off-hook noise. Id., 11:25–11:56.

Shortly thereafter, Detective Carson can be overheard talking to Detective Brown.  She stated, "His phone takes a fingerprint, so there's no way we are going to know today, unfortunately, since he's refusing [inaudible] counsel [inaudible]." Id., 12:01-12:09.

After discussing other matters observed in the bedrooms with the other members of law enforcement, Officer Warning and his bodycam then moved to the living room where the defendant was seated with his dog.  At approximately

12

19 minutes into the overall encounter, Detective Brown approached Taylor with the defendant's cellphone in his hand. See Id. at 18:29.

"As Detective Carson explained to you, we have a search warrant for your phone," Detective Brown stated to the defendant. "It gives us the authority to open it and dump it and all that stuff," he continued. Brown then asked Taylor, "What is your passcode to open your phone?" Id. 18:29–18:49.

Taylor responded after a pause, "Four thousand and five," or 4-0-0-5. Id., 18:49–19:01.

Detective Brown unlocked the phone in front of the defendant and walked in the direction of other members of law enforcement who were situated in the upper floor bedrooms. A conversation ensued among those officers, which is inaudible on the bodycam footage. Id., 19:01-19:43.

Detective Brown returned to the living room ten minutes later.[9] Brown and Taylor then discussed whether there were tablets in the residence. Id., 29:12-29:52.

---

[9] Officer Warning remained in the living room area for a sizeable portion of the encounter at the defendant's residence. His shop-talk with a Pennsylvania State Trooper about gear and uniforms drowns out any discussion by the detectives. Taylor stood up approximately four minutes into that conversation. After a brief exchange, the state trooper advised the defendant to remain seated. The officers continued with more work-adjacent discussions. At a later point, the state trooper engaged Taylor in a conversation about the whereabouts of his parents. After Taylor mentioned details of his parents' vacation itinerary, conversations between the officers turned to those leisure-related topics. (Warning BWC 19:43-29:10).

13

At this juncture, Officer Warning walked down the hallway to a bedroom where his colleague Detective Donaldson was scrolling through the defendant's phone. Donaldson then encountered what appears to be a passcode-protected application. This hurdle prompted Donaldson to leave the bedroom to obtain the passcode from Detective Brown. Donaldson and Warning passed by the state trooper and another member of the Pike County District Attorney's office speaking with Taylor about the defendant borrowing a friend's tablet. It appears that the county law enforcement officer was holding a tablet in her hand. The bodycam captures the sounds of that conversation continuing as the Slate Belt Regional members of the operations team walked down to the basement where Pike County detectives were searching through the desktop computer. The ongoing conversation between the state trooper and the defendant caused Detective Carson to walk upstairs in an effort to stop it. In the chain of events, Warning placed his hand over his bodycam after one detective remarked, "That's sheep porn." The placement of Warning's hand does not obscure footage of Detective Donaldson continuing to scroll through Taylor's phone or otherwise hide evidence of Detective Brown scrolling through files on the defendant's (or a family member's) desktop computer. Id., 29:52-36:30.

---

Based on a review of the bodycam footage, it is more likely than not that the officers were filling time and not deliberately preventing the microphone from picking up the discussions of the other members of law enforcement.

14

Detective Donaldson continued to look through Taylor's phone. Telegram messages in black and purple are visible on the screen in the bodycam video. As he scrolled, Donaldson remarked, "Two daddies and a son." Turning the screen toward Officer Warning, Donaldson said, "He looks young." Warning, or a different officer responded, "Yeah, 16 maybe. That's borderline right there." Shortly thereafter, Warning manually turned off his body camera.[10] Id., 36:30–38:45.

As Detective Carson testified, authorities did not arrest Taylor that day. (H.T., 72:6-8). Carson explained that she could not confirm on-scene that the "age-difficult" images and videos on Taylor's phone were child pornography. Id., 72:9-18. Additionally, according to Carson, Slate Belt Regional Police Department officers could not make an arrest without prosecutorial approval with respect to their investigation into the alleged messages to the 13-year-old. Id.

---

[10] Detective Carson read the contents of the Telegram messages into evidence during the suppression hearing. (H.T. 58:6–62:12). According to Carson, the individuals involved in the group chat were the defendant, co-defendant Kevin Abbott, and a minor victim. Id. As Carson testified, the defendants allegedly asked the minor victim through the Telegram group chat to send a photo of his penis, a photo of his face and penis, and a masturbation video. Id.

Detective Carson also read separate Telegram messages purportedly between Abbott and Taylor with respect to Taylor's alleged communications with the 13-year-old in Pen Argyl. Id. 65:7–70:25. Carson testified that there was a concern that Taylor would destroy evidence based on the content of the communications between the co-defendants. Id.

### *Carson's Testimony About the "Miranda Issue"*

At the evidentiary hearing, Detective Carson explained that she and Detective Donaldson performed manual on-site previews of Taylor's cellphone as is common in law enforcement practice. Id. 49:1-14, 51:16-24. Per Carson, no additional passwords were required to navigate the defendant's cellphone other than 4-0-0-5.[11] Id. 52:3-6.

After obtaining the devices pursuant to the warrants, Detective Carson returned to her office to perform a Cellebrite extraction of the defendant's phone. Id., 73:7-11. On September 16, 2024, she received an arrest warrant from Slate Belt Regional Police Department and took Taylor into custody. Id., 73:12-17. According to Carson's testimony, Taylor had already obtained a new cellphone.

---

[11] Taylor raised an ancillary argument in an "addendum" to his motion that evidence from Snapchat should be suppressed because officers "access[ed] defendant's account, unblock[ed] all the users from defendant's account that he previously blocked and manipulat[ed] other data without defendant's consent or a valid warrant to do such." (Doc. 78 at 6). According to the defendant, he obtained a new cellphone on September 14, 2024, hours after his phone was seized pursuant to the warrant. Id. at 5. Defendant argues that "two emails from defendant's Gmail account will show that his password was changed during the search warrant beforehand." Id. at 5–6.

There was no evidence presented at the suppression hearing demonstrating that the authorities manipulated defendant's Snapchat account. That is, the defendant did not confront Carson with those ostensible emails from his Gmail account during the hearing. The evidence available to the court is Detective Carson's testimony that Detective Donaldson accessed Taylor's Snapchat account and sent a package of the chats, images, and videos to himself. (H.T. 71:1–72:5, 103:2-12). Thus, after careful consideration of defendant's arguments on this issue, and the extensive footnote offered by the government in their supplemental brief, (Doc. 89 at 16–17 n.3), this alteration of evidence argument is better suited for cross-examination of the detectives at trial, not grounds to suppress the Snapchat evidence.

16

Id. Additionally, per Carson, Taylor had deleted his Telegram account during the interlude, which prevented her from loading more messages within that application on his cellphone. Id. 113:2–15.

Post-arrest, Detective Carson communicated about defendant's case with Pike County District Attorney Ray Tonkin. Id., 89:7–92:23. The two discussed a potential "Miranda issue." Id. Prosecutors requested that Carson perform a second forensic download of Taylor's cellphone without using the 4-0-0-5 passcode to unlock it. Id., 92:13-23. Carson testified that she was able to access the device and recover the images and videos from the "Two Daddies and a Son" Telegram group chat. Id., 79:7–23. According to Carson, she also recovered the 4-0-0-5 code from the extracted data as an auto-fill password. Id., 79:24–80:20.

From the data, Carson also determined that 4-0-0-5 was a reused code. Taylor messaged friends with that code so they could access his community via the gate. Id., 80:21–83:8. Carson further testified that she did not have to use "brute force" to access Taylor's phone, meaning she did not have to use the Cellebrite software to try every possible numerical passcode in order to access the device. Id., 83:8–85:1.

Taylor's suppression arguments have shifted in this case. The path from his initial motion to his post-hearing brief is littered with abandoned arguments. What remains to be discussed below is a theory of coercion that the record does

17

not support, a request for relief that the law does not authorize, and arguments concerning evidence that the government would have inevitably discovered. The motion to suppress will be denied and this matter will be scheduled for trial.

**Standard of Review**

The applicable burden of proof on a suppression motion begins with the defendant, who must establish a factual basis for the suppression hearing. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996). Once the defendant makes that showing, the burden rests upon the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible. See United States v. Matlock, 415 U.S. 164, 177 (1974). As discussed below, the government has met its burden, and the motion to suppress will be denied.

**Analysis**

1. **The Edwards Violations Themselves Do Not Justify Suppression of the Derivative Cellphone Evidence**

The Fifth Amendment to the United States Constitution states, among other things, that no person "shall be compelled in any criminal case to be a witness against himself."[12] U.S. CONST. AMEND. V. The privilege provided by the Self-Incrimination Clause "protects individuals not only from legal compulsion to testify

---

[12] "[T]he Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States." Malloy v. Hogan, 378 U.S. 1, 6 (1964).

18

in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.' " Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (quoting Miranda v. Arizona, 384 U.S. 436, 461 (1966)).

This case involves the prophylactic layers that the Supreme Court has built around the Fifth Amendment privilege. The first layer is from Miranda. Before a custodial interrogation begins, officers must warn a suspect of his right to remain silent and his right to an attorney. 384 U.S. at 444. Miranda warnings protect the constitutional right against self-incrimination from the inherent pressures of custodial interrogation. See Maryland v. Shatzer, 559 U.S. 98, 103–04 (2010) (citing Miranda, 384 U.S. at 444, 456–57, 458, 473–74). However, a violation of Miranda is not tantamount to a violation of the Fifth Amendment. See Vega v. Tekoh, 597 U.S. 134, 141–46 (2022); Oregon v. Elstad, 470 U.S. 298, 306 (1985) ("The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation." Although Detective Carson described a "Miranda issue" being flagged by a state prosecutor in this case, Miranda has not been violated here.

Rather, the defendant experienced a violation of the second layer of protection for criminal suspects. The second prophylactic measure is from Edwards: once a suspect invokes his right to counsel, all interrogation must stop,

19

and officers may not resume questioning unless the suspect himself reinitiates contact or counsel is made available. [13] 451 U.S. at 484–85; see also McNeil v. Wisconsin, 501 U.S. 171, 176 (1991). "The remedy for a violation of Miranda or Edwards is straightforward—any statement given in violation of the rules established in these cases cannot be introduced into evidence in the [government's] case-in-chief." Alston v. Redman, 34 F.3d 1237, 1243 (3d Cir. 1994) (citations omitted).

But, like Miranda, the rule in Edwards is not a constitutional mandate. Shatzer, 559 U.S. at 105 (citations omitted). Thus, a violation of Edwards is also not tantamount to a violation of the Fifth Amendment. United States v. Curry, 158 F.4th 153, 160 and n.12 (3d Cir. 2025), cert. denied, No. 25-6567, 2026 WL 490825 (U.S. Feb. 23, 2026) ("to substantiate an Edwards violation, a defendant need not show that a statement was "compelled" under the Fifth Amendment. So a statement can be constitutionally voluntary, yet inadmissible because of Edwards.").

Here, the defendant seeks to suppress physical evidence based on the admitted violation of Edwards. But the remedy in this case depends on whether

---

[13] The government agrees that any of Taylor's direct statements should be suppressed. (See Doc. 89, Gov. Supp. Br. in Opp. at 41) ("the Government asks that the Court grant any request made by Defendant to suppress in the Government's case-in-chief, any statements elicited from Defendant, after he invoked his right to counsel.").

20

police conduct violated the prophylaxis rules or Taylor's constitutional rights.  The police only violated the prophylaxis rules, not the defendant's Fifth Amendment rights.  Thus, Taylor's remedy is limited.

To reiterate, there is a distinction between violations of the Fifth Amendment and violations of <u>Miranda</u> and <u>Edwards</u>.  <u>Curry</u>, 158 F.4th at 158. There is also a distinction between direct evidence and derivative evidence under the case law. <u>Id.</u> at 159.

<u>Curry</u> explains how those distinctions bear out in a case like this one:

1) "Actual constitutional violations are handled under a single standard: they render both direct and derivative evidence inadmissible." <u>Id.</u> (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963)).

2) Direct evidence collected in a manner "afoul of <u>Miranda</u>" is not admissible. <u>Id.</u> (citing <u>United States v. DeSumma</u>, 272 F.3d 176, 180 (3d Cir. 2001)).  And if "police interrogate a suspect who asked to speak with an attorney, courts treat direct evidence of that conversation as if no <u>Miranda</u> warning was given, even if the suspect otherwise validly waived his rights." <u>Arizona v. Roberson</u>, 486 U.S. 675, 681–82 (1988).

3) But derivative physical evidence is not subject to suppression as the result of an <u>Edwards</u> violation, so long as only the prophylactic rule — and not the suspect's Fifth Amendment right against compelled self-incrimination — was violated. <u>Id.</u> at 158, 160–61.

4) "With no constitutional concerns, <u>Wong Sun</u>'s automatic exclusion of derivative evidence does not apply." <u>Id.</u> at 160.

In this case and in <u>Curry</u>, the defendants were Mirandized, invoked their right to counsel, and were then asked about a cellphone.  In both cases, the

21

defendants then provided detectives with the passcode to their cellphones.  In Curry and in this case, the defendant objected to prosecutors using incriminating materials found on his phone at trial.  In Curry, the Third Circuit determined that courts cannot exclude derivative evidence to remedy a violation of Edwards. Id. at 156.  Thus, like in Curry, the evidence found on Taylor's cellphone will not be suppressed.

### 2. Taylor's Coercion Theory Falls Short

To get around Curry, the defendant argues that he was coerced or compelled to give up the location of his cellphone and its password.  But, as Curry explains, the bar for compulsion under the Fifth Amendment is high. Id. at 158.  Taylor would have "to show that his will was overborne in such way as to render his confession the product of coercion based on the totality of all the surrounding circumstances."[14] Id. (cleaned up).  The totality of the circumstances approach to coercion weighs such factors such as the length and conditions of detention, the defendant's age and intelligence, the use of threats or promises, whether physical punishment is applied and whether such punishment includes deprivation of food and sleep. Schneckloth, 412 U.S. at 226 (citations omitted).

---

[14] In other words, Taylor would have to essentially demonstrate the violation of another part of the Fifth Amendment — the Due Process Clause. See Curry, 158 F. 4th at 158 and n.4 (citing Dickerson v. United States, 530 U.S. 428, 434 (2000); Arizona v. Fulminante, 499 U.S. 279, 288 (1991); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

22

Based on the record, there is nothing in the factual sequence suggesting coercion, compulsion, or that the defendant's will was overcome by the police. The police offered Taylor choices, and the bodycam shows that the defendant deliberated on his options. When Detective Carson asked for the phone's location in the car, Detective Brown told Taylor that the alternative was impounding the vehicle and, implicitly, obtaining a warrant. When Detective Carson asked Taylor to ride with them and let them into the house, she told the defendant that the alternative was breaking down the door.

When Detective Brown asked defendant for the passcode to the phone roughly twenty minutes later, the defendant was not inside a windowless interrogation box at a police station. He was seated in his own living room surrounded by his own things. Brown reminded the defendant of the warrant and simply asked for the code. And Taylor obliged, voluntarily. He had time to weigh his options.

Furthermore, Taylor is not an unsophisticated person. At the time of the events, he was in his late 20s. He had experience in the criminal justice system. He demonstrated his understanding of his rights by asking for a lawyer.

On that note, the officers in this case admittedly kept talking to the defendant after he requested a lawyer, which was wrong. But the detectives interacting with Taylor did not threaten him, promise him leniency, or deprive him

23

of any necessities.  There is also no evidence of physical intimidation, psychological pressure, prolonged isolation, or discriminatory comments based on the defendant's race, sexual orientation, or gender identity.  The officers talked to the defendant at a distance, and in a moderated tone of voice.  They spoke to him either on a quiet private road inside a gated community or while he was sitting in a rocking chair with his dog at his feet in his own living room.  No reasonable view of this record supports any finding of coercion or compulsion.

### 3. Inevitable Discovery of the Cellphone Evidence

Although Curry is controlling and there was no coercion in this case, the inevitable discovery exception to the exclusionary rule also defeats the motion to suppress.[15]

The inevitable discovery doctrine "permits the introduction of evidence that inevitably would have been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful." United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992).  "If the prosecution can

---

[15] Taylor's initial brief in support of the motion to suppress asserts a Fourth Amendment violation for an unreasonable search of his cellphone. (Doc. 56 at 3).  The government's brief in opposition attaches two search warrants for electronic devices which authorizes searches of the devices by computer forensic examination. (Docs. 72-1, 72-2).  To the extent that Taylor maintains that the officers violated Riley v. California, 573 U.S. 373 (2014), that argument is rejected. The officers had a warrant to seize and search the contents of the cellphone.  Taylor also voluntarily consented to officers retrieving it from the glove compartment of his vehicle.  But because this Fourth Amendment argument still lingers, (see Doc. 78, Def. Addendum), the court considers the application of the inevitable discovery doctrine.

24

establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…then the deterrence rationale has so little basis that the evidence should be admitted." Nix v. Williams, 467 U.S. 431, 444 (1984).  The government "can satisfy that burden by demonstrating that the police, following their routine procedures, would have uncovered [the evidence]." United States v. Bradley, 959 F.3d 551, 557 (3d Cir. 2020) (United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998)). The focus "is on 'historical facts capable of ready verification, and not speculation.' " United States v. Alexander, 54 F.4th 162, 174 (3d Cir. 2022) (quoting United States v. Stabile, 633 F.3d 219, 245 (3d Cir. 2011; Vasquez De Reyes, 149 F.3d at 195)).

The government meets that burden in this case.  The detectives had warrants authorizing a search of defendant's person and his house for electronic devices.  The warrants did not cover Taylor's car, but the officers communicated to the defendant that they would impound the vehicle and implied that they would obtain a third search warrant, even before the Edwards violation bore any fruit. Consequently, Detective Brown's statement to Taylor about impounding the car in the bodycam video is not a prosecution-driven reconstruction, but a contemporaneous declaration of collective law-enforcement intent.

Inevitability is a high threshold. <u>Alexander</u>, 54 F.4th at 174.  However, Detective Carson obtained a ping warrant, two search warrants, and helped stage a seven-officer operation to search Taylor's home for electronic devices early on a Saturday morning.  Applying for a third search warrant to obtain the defendant's cellphone was an extra step the police were ready to carry out.  Accordingly, the detectives would have inevitably discovered the cellphone inside defendant's glove compartment whether Taylor consented to the search or not and whether the officers violated <u>Edwards</u> or not.

Once the cellphone was seized, Detective Carson testified that she could extract the phone's data without the passcode using a Cellebrite extraction tool and software.  Her testimony establishes that she was not speculating.  When she later attempted the Cellebrite extraction without a passcode — after being advised of the potential <u>Edwards</u> issue — the device revealed that Taylor had stored the passcode on the phone itself, set to auto-fill.  The second extraction also revealed that the defendant had reused the code for other purposes like the entry gate to his community.  It takes no great investigative insight to try a four-digit code found on a device as the passcode to that same device.

In sum, the detectives would have impounded the car. They would have obtained a warrant. They would have seized the phone. Detective Carson would have run the Cellebrite extraction without a passcode.  Once Carson discovered

the auto-fill or the gate code among the phone's unencrypted messages, trying it as the phone's passcode would have been an obvious next step — not an investigative leap.  Every link in that chain rests on either established law enforcement practice or uncontested testimony. Thus, by a preponderance of the evidence, the government has established that the cellphone's contents would have been discovered regardless of whether the defendant ever spoke.  The inevitable discovery exception applies.  For this additional reason, defendant's motion to suppress will be denied.

**Conclusion**

For the reasons set forth above, Defendant Rashaad Taylor's motion to suppress, (Doc. 55, as amended/corrected by Doc. 78) will be denied to the extent that it seeks to suppress evidence derived from his cellphone.  Although the motion does not specifically seek such relief, any statements elicited from defendant after he invoked his right to counsel will be suppressed.  By way of separate order, this matter will be listed for trial.

Date: 4/17/26

BY THE COURT:

JUDGE JULIA K. MUNLEY
United States District Court

27